**Derrick PROCTOR, doing business under the firm name and style of Library & Educational Services, Plaintiff,**

v.

**GENERAL CONFERENCE OF SEVENTH–DAY ADVENTISTS, et al., Defendants.**

No. 81 C 4938.

United States District Court, N.D. Illinois, E.D.

Oct. 29, 1986.

Matthew N. Chaconas, Michael H. Erde, Erde and Chaconas, Chicago, Ill., for plaintiff.

Harvey M. Applebaum, Charles E. Lister, Lyn M. Schlitt, Covington & Burling, Washington, D.C., Earl E. Pollock, Michael P. Fontana, Louis C. Keiler, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., Carole D. Bos, Buchanan & Bos, Grand Rapids, Mich., William J. Pearson, Peter J. Johnson & Associates, St. Joseph, Mich., George Barr, Codo Bonds Zumstein & Konzelman, Joliet, Ill., Lee Boothby, Robert A. Yingst, Boothby, Huff & Yingst, Berrien Springs, Mich., Peter Solber, Robert J. Kriss, Robert F. Finke, Mayer, Brown & Platt, Chicago, Ill., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT ORDER

WILLIAM T. HART, District Judge.

This case is before the court after a bench trial[1] for entry of findings of fact, conclusions of law and a judgment order.

Plaintiff Derrick Proctor, doing business as Library and Educational Services (sometimes referred to as "LES") brings this suit against certain associations known as the General Conference of Seventh-day Adventists; the Lake Union Conference of Seventh-day Adventists, individually and doing business as Home Health Educational Service; the Review & Herald Publishing association; the Carolina, Illinois, Michigan and Indiana Conferences of Seventh-day Adventists; and the Carolina, Illinois, Michigan and Indiana Adventist Book Centers ("ABCs"). These defendants are referred to collectively as the Church defendants.[2] Plaintiff also brings suit against Your Story Hour, Inc. ("YSH"). Plaintiff alleges that the Church defendants violated §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and intentionally and tortiously interfered with his contractual and business relations. Plaintiff alleges that Your Story Hour, Inc. violated § 1 of the Sherman Act (15 U.S.C. § 1) and § 2(a) of the Robinson-Patman Act (15 U.S.C. § 13(a)).

Jurisdiction of the antitrust claims exists pursuant to 28 U.S.C. § 1337. The tortious interference claims are properly pendant to the antitrust claims. Plaintiff seeks damages and injunctive relief under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

Plaintiff is a wholesaler of religious literature. A large portion of plaintiff's business consists of sales of Seventh-day Adventist literature to churches, schools, libraries and to colporteurs. Occasionally he sells to the public. Plaintiff claims that the

---

1. The parties waived trial by jury after a pretrial order was submitted.

2. Certain defendant not-for-profit corporations which hold property belonging to the associations were voluntarily dismissed from the suit. Plaintiff settled with certain defendants and summary judgment was granted in favor of defendant Zondervan on June 24, 1983.

Church defendants acted unlawfully by: (1) conspiring among themselves and with independent publishers to keep him from obtaining Adventist literature; (2) imposing illegal territorial and retail price maintenance restraints; (3) monopolizing Adventist and other religious literature; and (4) tortiously interfering with his business. Plaintiff has profited from the sale of Adventist literature at prices substantially below maintained prices.

Church defendants claim that the First Amendment religion clauses protect their actions, that the Sherman Act does not apply to their activities, that Proctor has not proven any antitrust injury or tortious interference, and that they are innocent of any violations of antitrust law.

Proctor also claims that as a result of an illegal conspiracy with the Michigan Adventist Book Center ("ABC"), Your Story Hour ("YSH") raised its prices and refused to deal with him. Proctor also claims that YSH engaged in illegal price discrimination by selling at lower prices to the Michigan ABC than to him.

YSH claims that Proctor has not proven any conspiracy, and that Proctor has not met the jurisdictional requirements of the Robinson-Patman Act needed for showing price discrimination.

Proctor seeks damages from $878,339 to $2,459,348. Included is $242,850 from Your Story Hour. Proctor also seeks a permanent injunction forcing defendants to sell to him at the discount rate that he was receiving prior to the alleged violations.

## I. FINDINGS OF FACT

The court finds the facts to be as follows:

### A.

The court adopts the parties' statement of uncontested facts as contained in the final pretrial order as findings of fact 1 through 75. (All objections as to relevancy concerning the uncontested facts are overruled. All objections in the uncontested facts concerning events prior to a December 19, 1979 settlement agreement are also overruled. However, as will be indicated the settlement agreement is binding on the parties, and the conduct of the Church defendants prior to December 19, 1979 will be treated as within the purview of the settlement agreement.)

1. Plaintiff, Derrick Proctor, is a resident of Berrien Springs, Michigan. Since 1976 he has been in the business of selling religious and secular books, cassettes and related educational items under the name of Library & Educational Services. Since 1969 he has been a teacher at Andrews University located in Berrien Springs where he is currently an associate professor of Psychology. Proctor is a Seventh-day Adventist.

2. Berrien Springs is a community in southwestern Michigan with a population of less than 6,000 people. Many of its residents are Seventh-day Adventists.

3. The defendant, General Conference of Seventh-day Adventists ("General Conference") is an organization whose membership consists of Seventh-day Adventist union conferences and union missions, the later being located outside of North America. The General Conference has ten world division sections, each division operating within a specified geographical territory. The territory of the North American Division includes the United States, Canada, and Bermuda. Within each division of the General Conference there are union conferences, and within each union conference there are local conferences. Within the United States, the geographical territory covered by each local conference normally is coextensive with the boundaries of a particular state or, in a few instances, more than one state. The union conferences cover multi-state areas. The General Conference and the union and local conferences are organized as unincorporated associations. The offices of the General Conference are located in Washington, D.C. The Constitution and by-laws of the General Conference are marked as an exhibit in this case.

4. The Lake Union Conference of Seventh-day Adventists ("Lake Union Conference" or "Lake Union") is one of nine union

conferences within the North American Division of the General Conference. The territory of the Lake Union Conference consists of the states of Illinois, Indiana, Michigan, and Wisconsin. The offices of the Lake Union are located in Berrien Springs, Michigan. The Constitution and by-laws of the Lake Union Conference are marked as an exhibit in this case.

5. The Michigan Conference of Seventh-day Adventists ("Michigan Conference"), the Illinois Conference of Seventh-day Adventists ("Illinois Conference"), the Indiana Conference of Seventh-day Adventists ("Indiana Conference"), and the Carolina Conference of Seventh-day Adventists ("Carolina Conference") are four of the local conferences in the United States whose memberships consist of Seventh-day Adventist churches located within their respective geographic territories. The offices of these local conferences are located in Lansing, Michigan; Brookfield, Illinois; Carmel, Indiana, and Charlotte, North Carolina, respectively. The territory of the Carolina conference is not located within the Lake Union Conference. The Constitution and by-laws of these conferences are marked as exhibits in this case. There are approximately 50 local conferences in the United States.

6. The Illinois, Indiana, Michigan, and Carolina Conferences each operate ABCs located within their respective conference territories. In addition, the majority of the remaining approximately 46 local conferences in the United States also operate their own Adventist Book Centers.

7. The Review & Herald Publishing Association is located in Hagerstown, Maryland. The Constitution and by-laws of the Review & Herald are marked as an exhibit in this case.

8. Your Story Hour is a Michigan not-for-profit corporation with offices in Berrien Springs, Michigan and Medina, Ohio.

9. Baker Book House is a Michigan corporation which publishes and sells religious books and materials with offices and/or stores in St. Joseph, Michigan, Grand Rapids, Michigan and Holland, Michigan.

10. There are several categories of religious and health books and other literature which are published by the Review & Herald and by the Pacific Press Publishing Association. One category is referred to as "subscription books." Most sales of subscription books are to non-Seventh-day Adventists.

11. Some of the more popular titles of subscription books are *The Bible Story, My Bible Friends, Uncle Arthur's Bedtime Stories, Conflict of the Ages, You and Your Health,* and *Modern Medical Guide.* Prior to December 31, 1983 the list price for the 10 volume *Bible Story* set together with one additional volume of the *Bible Reference Library* sold by Literature Evangelists in Illinois, Michigan, and Wisconsin was $274.95.

12. A second category of books published by the Review & Herald is referred to as "trade books." So-called "trade books" are distributed through Adventist Book Centers operated by the local conferences and are sold for the most part to Seventh-day Adventists.

13. A third category of books published by the Review & Herald is textbooks.

14. A fourth category of books published by the Review & Herald is missionary books.

15. A fifth category of publications published by the Review & Herald is periodicals.

16. The Home Health Education Service offices ("HHES") are departments operated by each of the nine Union Conferences in North America.

17. The Lake Region Conference of Seventh-day Adventists is a Regional Conference whose territory consists of the same territory as the Lake Union Conference (states of Michigan, Indiana, Illinois and Wisconsin) with the addition of parts of the State of Minnesota. The Lake Region Conference is one of the conferences which are members of the Lake Union Conference. The Lake Region Conference is not named as a defendant in the lawsuit.

18. The Family Health Education Services offices ("FHES") are departments operated by the Regional Conferences. The FHES office of the Lake Region Conference is located in Chicago, Illinois.

19. Andrews University is listed in the Seventh-day Adventist yearbook as a denominationally owned educational institution located in Berrien Springs, Michigan.

20. From 1959 to the fall of 1976 J.W. Proctor, Derrick Proctor's father, was the publishing director of the Lake Union Conference.

21. The plaintiff, Derrick Proctor, began selling Seventh-day Adventist subscription literature as a student Literature Evangelist.

22. In 1975 Proctor started to sell subscription literature which he obtained from the Lake Union Conference office on a part time basis primarily to Catholic schools and public libraries.

23. In 1976 Proctor established LES for the purpose of selling books and other educational items.

24. In 1976, after J.W. Proctor retired from his position as Lake Union publishing director, John Bernet assumed that position. After John Bernet became publishing director (during late 1976 or early 1977) he asked Proctor to stop selling subscription books for the HHES.

25. Proctor again began to sell subscription literature which he obtained from the Lake Union HHES starting in 1978. At that time and continuing into late 1979, Proctor purchased subscription literature from the HHES of the Lake Union Conference at a discount of 70.78% off the suggested retail price for resale to certain customers.

26. During 1979 through 1984, Proctor purchased non-Adventist books and other educational materials for resale from several suppliers including: Zondervan Publishing Company and Concordia Publishing. He purchased products from Western Publishing Company from 1979 through 1982 and from Thomas Nelson Publishers during 1979 and 1980.

27. On October 23 and 24, 1979, managers of the Adventist Book Centers within the Lake Union Conference, which includes the Michigan, Illinois, Indiana and Wisconsin Conferences met with leaders of the Lake Union Conference publishing department for their regular annual Lake Union Conference Adventist Book Center Council in Madison, Wisconsin.

28. After the October 1979 Adventist Book Center Council meeting some of the participants contacted one or more of Proctor's suppliers and questioned why it was that Proctor, who was able to purchase from these suppliers at a jobber discount, was selling to the general public at prices which in some instances were lower than the prices at which the Adventist Book Centers could purchase the same books from these suppliers.

29. Edwin Lindsay, the manager of the Illinois Adventist Book Center was present at the October, 1979, Adventist Book Center Council meeting. On November 5, 1979, Lindsay sent letters marked as Plaintiff's Exhibits 25 and 26 to Western Publishing Company and Concordia Publishing House respectively. He also sent similar letters to Zondervan Corporation and Baker Book House. Before sending these letters he submitted the text to the Illinois Conference Adventist Book Center In-house Committee composed of the conference officers, publishing director, Sabbath School personal ministry secretary, and Lindsay.

30. Don Stricker was the manager of the Indiana Adventist Book Center and was present at the October, 1979 Adventist Book Center Council meeting. On November 20, 1979, he wrote a letter to Zondervan Corporation which is marked as an exhibit in this case.

31. On November 29, 1979, Clyde Kinder, Associate Director of the publishing department of the General Conference, wrote a letter to the Union Adventist Book Center Coordinators (who are the Union Publishing Directors) in the North American Division of the General Conference which referred to Proctor. This letter is marked as Plaintiff's Exhibit 23.

32. In November of 1979 Kinder telephoned Dwain Ford, then Academic Dean of the College of Arts and Sciences at Andrews University, and indicated his displeasure with certain book selling activities of one of their teachers.

33. Copies of the North American Division working policy in effect from October, 1976 through October, 1981, are marked as exhibits.

34. In November and December of 1979 Proctor on several occasions met with John Bernet, Lake Union Publishing Director, George Dronen, Reg Frood, associate directors, Lowell Bock, then President of the Lake Union Conference, Robert Carter, then Secretary of the Lake Union, and George Crumley, then Treasurer of the Lake Union Conference, in the Lake Union Conference office.

35. During January or February of 1980, Bill Morgan, Manager of the Michigan Adventist Book Center branch in Berrien Springs, Michigan, wrote a note to Ralph Ahnberg, sales manager of Your Story Hour.

36. Gordon Engen, during the time in question, was Chairman of the Board and until 1982 was President of Your Story Hour.

37. On February 10, 1982 Your Story Hour entered into a distributor agreement with an organization known as the Adventist World Purchasing Service ("AWPS").

38. Principally during 1979, and perhaps during 1980, Bill Morgan had several conversations (or at least one conversation) with Jake Reedyk, Manager of the Baker Book House retail store in St. Joseph, Michigan.

39. Morgan provided Reedyk with a copy or copies of Proctor's advertisements.

40. One Sunday in April of 1980 Joe Raineri, the credit manager of the HHES, was assisting Bill Morgan in running an Adventist Book Center display at a flea market in an auditorium located on the campus of Andrews University. They were selling articles depicted in photographs which are marked as exhibits in this case. While plaintiff was looking at the books on sale at the display Joe Raineri stated "if you like the prices so much why don't you take a picture." Proctor then pulled a camera out of his pocket and began taking pictures.

41. Samuele Bacchiocchi is a professor of Church History and Theology at Andrews University. He is also an author of the following two publications: *From Sabbath to Sunday* and *Divine Rest for Human Restlessness*. During 1980, Proctor and the Michigan branch Adventist Book Center in Berrien Springs, Michigan, purchased his books. In August of 1980 Bill Morgan, Manager of the Berrien Springs Adventist Book Center branch telephoned Dr. Bacchiocchi and asked him what wholesale price he was charging "downtown" for his newly released book *"Divine Rest for Human Restlessness."*

42. Four or five days after his conversation with Bill Morgan Dr. Bacchiocchi suggested to J.W. Proctor who at that time was operating a retail bookstore in Berrien Springs named Great Lakes Book and Antiques, that it would be nice if they could avoid tension in their community by selling the books at somewhat similar prices as the Adventist Book Center.

43. Plaintiff's Exhibit 1 dated October 31, 1980 was written by Dr. Bacchiocchi after a meeting with Bill Morgan. Plaintiff's Exhibit 2 dated April 28, 1981 was written by Dr. Bacchiocchi after a meeting with Proctor and Proctor's Attorney, Norm Perry.

44. Several years prior to the events between Bacchiocchi, Morgan and Proctor, on a couple occasions Adventist Book Center managers made Dr. Bacchiocchi aware that if he sold his book directly to individuals who attended his lectures at a wholesale price it would be difficult for the Adventist Book Center to sell his book in the same community at a higher price.

45. In late 1980 Edwin Lindsay, as manager of the Illinois Adventist Book Center, filled at least one order from Proctor for certain Adventist books. Lindsay thereafter refused to fill at least one subsequent order from Proctor after he was instructed

not to do so by Robert Carter, President of the Lake Union Conference, Clyde Kinder, Associate Director of Publishing Council of the General Conference, and Walter Carson, Associate Counsel for the General Conference.

46. During 1980 Bonner Allen was the Manager of the Michigan Adventist Book Center located in Lansing, Michigan, which had a branch located in Berrien Springs, Michigan, managed by Morgan. Joyce Schwarz, wife of Richard Schwarz, who will be referred to later, has been an employee of the Berrien Springs branch Adventist Book Center. In January, 1981, Proctor submitted a written order for trade books to the Michigan ABC which was filled. Thereafter, a dispute arose between Proctor and Allen over whether Proctor was entitled to a 30% discount on the trade books included in that order.

47. From December of 1980 through March of 1981 Doug Sayles, the Manager of the Carolina Adventist Book Center located in Charlotte, North Carolina, filled eight orders for trade books and/or missionary books for Proctor at discounts by Doug Sayles ranging from 10% to 35% depending on the titles.

48. During 1981 Bill Morgan brought to the attention of Allen that Proctor was advertising certain trade books in the Berrien Springs area at a price lower than or close to what the Michigan Adventist Book Center had to pay for the same books. Allen called the Pacific Press Publishing Association, then located in Mountain View, California, to ascertain whether or not the Pacific Press was supplying Proctor with trade books. The Pacific Press informed Allen that they were not selling trade books to Proctor. Later, Allen found out that Proctor had purchased some trade books from Doug Sayles, the Manager of the Carolina Adventist Book Center.

49. On or about April of 1981 Allen called Sayles' office and told Sayles' Assistant that their sales to Proctor of trade books had hurt the Michigan Adventist Book Center in the Berrien Springs area because the prices Proctor was offering were at or below what the Michigan Adventist Book Centers had to pay for the books. Allen further pointed out to Sayles, at a later date, during a face to face conversation, the problem that they faced in Berrien Springs, Michigan, because of the sale.

50. In April 1981 the Carolina Adventist Book Center discontinued fillings orders for trade books from Proctor giving as its reason the fact that Proctor was located outside the assigned territory of the Carolina Adventist Book Center and that such out of territory sales were contrary to established General Conference policy. It was suggested that Proctor purchase them from the Adventist Book Center in his territory, that is, the Michigan Adventist Book Center.

51. Sayles was not aware of a policy prohibiting Adventist Book Centers from selling to wholesalers. Prior to December, 1981 Allen was not aware of such a policy.

52. Theron Collins succeeded Bonner Allen as Manager of the Michigan Adventist Book Center on January 15, 1983. He still holds that position today.

53. Andrews University operates a bookstore on the campus which is managed by Faye Chamberlain. Both the Andrews University bookstore and Proctor have several of the same suppliers including Zondervan. Faye Chamberlain received complaints from customers regarding Proctor's low prices when compared to the prices charged by the Andrews University bookstore. In addition, in late 1979 Bill Morgan, Manager of the Michigan branch ABC in Berrien Springs, Michigan, spoke to Faye Chamberlain regarding a sale Proctor had.

54. In the fall of 1979 a representative of Andrews University bookstore contacted one of its suppliers which also happened to be one of Proctor's suppliers to see how she could get a better discount in light of the discount that Proctor was receiving.

55. In the fall of 1979, Faye Chamberlain also contacted Dwain Ford, the Academic Dean of the Undergraduate School of Andrews University, about Proctor.

56. Michael Bogdanovitch, who is responsible for Industries on campus, is Faye Chamberlain's superior and he also contacted Dean Ford in the fall of 1979 and brought to Dean Ford's attention essentially the same matters regarding Proctor which were raised by Faye Chamberlain.

57. During 1979 and up to the present time, Richard Schwarz has been the Vice President of Academic Affairs at Andrews University. In June of 1979 Proctor met with Schwarz and in December of 1980 Proctor met with Dean Ford and Schwarz in Schwarz' office.

58. Proctor has purchased or has attempted to purchase certain subscription books on a number of occasions from T.S. Barber, who is the publishing director of the Lake Region Conference and director of the FHES office of that conference in Chicago, Illinois. Such books were obtained from the FHES by Proctor either directly or indirectly through his father, J.W. Proctor, and possibly other sources. Also since at least July, 1981, on various occasions Proctor has obtained subscription books from Barber of the Lake Region FHES office in Chicago, Illinois, and through various other sources.

59. In April, 1982, the Annual Meeting of the North American Division publishing council of the General Conference was held in the Phoenix, Arizona, area. Among those in attendance were Charles E. Bradford, General Conference Vice President of North America, Robert Carter, President of the Lake Union Conference, Louis Ramirez, Publishing Director of the General Conference, C.M. Willis, Associate Publishing Secretary of the General Conference, Harold Otis, General Manager of the Review & Herald, Robert Kinney, Book Department Manager of the Review & Herald, John Bernet, and Barber. While these men were in Phoenix they met specifically with Barber who was instructed to be present and was questioned regarding evidence that Proctor had obtained certain subscription books from Barber.

60. In April of 1983 the next annual meeting of the North American Division Publishing council of the General Confer-ence was held at Daytona Beach, Florida. Among those in attendance were Charles Bradford, Clyde Kinder, C.M. Willis, Robert Woodfork, Harold Otis, Bob Kinney, Robert Carter, John Bernet, and Charles Joseph. Barber was instructed by Bradford to be present at Daytona Beach where he again was questioned regarding additional evidence that Proctor was continuing to obtain subscription books from Barber. At this meeting Barber was shown books, which were purchased from Proctor which had been previously marked in ultra violet ink, at the Review & Herald before the books were sold and shipped to the Lake Region Conference.

61. In February of 1982 Paul Jensen, at that time Publishing Director of the Illinois Conference, circulated a monthly newsletter to Literature Evangelists. The newsletter for the month of February, 1982, is marked as Plaintiff's Exhibit 215.

62. While Publishing Director in Illinois, one of Jensen's responsibilities was training Literature Evangelists.

63. In July of 1982 Proctor attended a Christian Book Sellers Association convention in Dallas, Texas. Clyde Kinder, Associate Publishing Director of the General Conference, and Earl Johnson of Chapel Records, a part of the Pacific Press Publishing Association in Mountain View, California, also attended that convention and had a conversation with Proctor.

64. In October of 1982 Lyn Schlitt, one of the attorneys for the General Conference, addressed the delegates who were present at a General Conference Annual Council Session in Takoma Park, Maryland.

65. On October 18, 1982, and January 3, 1984, Walter Carson caused a letter to be sent to Presidents, Adventist Book Center Managers, and Publishing Directors of local and union conferences throughout North America which are marked as exhibits in this case.

66. On November 11, 1982, and February 7, 1983, Paul W. Roesel, Superintendent of Education for the Pennsylvania Conference of the Seventh-day Adventists, sent

to all of the teachers in his conference letters which are marked as exhibits in this case.

67. On November 9, 1982, and June 23, 1983, D.K. Sullivan, President of the Texico Conference of the Seventh-day Adventists, sent to all pastors, teachers, literature evangelists, academy personnel, and office and Adventist Book Center staff in that conference, letters which are marked as exhibits in this case.

68. Don Driver was the pastor of the Berrien Springs Seventh-day Adventist Church where Proctor had his Church membership. Up until the fall of 1981 Proctor was an elder in his Church. An elder is a person who assists the pastor in Church activities. When Proctor's annual review came up, the nominating committee did not reinstate him and the Chairman of the committee told the pastor that the committee did not believe that Proctor should be serving on the Board of Elders when he is in litigation against the Church.

69. During 1982 Bonnie Proctor, the wife of Proctor, was nominated by the church nominating committee to be head deaconess of the Berrien Springs Village Church. Thereafter the Board of Elders voted to have the pastor ask her to step down because of the existence of Proctor's lawsuit.

70. From April of 1979 to the present, John Mason has been the Publishing Director of the Columbia Union Conference of Seventh-day Adventists which includes in its territory the states of Pennsylvania, Maryland, Delaware, Virginia, West Virginia, New Jersey, Washington, D.C., and Ohio. On March 1, 1982, Mason sent a copy of a February 17, 1982, Illinois conference newsletter, marked as an exhibit in this case, to all publishing directors, associates, and assistants in the Columbia Union Conference.

71. In August of 1983 Mason addressed Pastors and teachers and their families at an All-Workers Convocation of the Potomac Conference of Seventh-day Adventists held in New Market, Virginia, during which he distributed a packet of documents which is marked as an exhibit in this case.

72. Gordon Klocko had invited Proctor to attend the Potomac Conference All Workers Convocation in August of 1983. However, Klocko was instructed by a conference official to withdraw the invitation to Proctor.

73. On April 7, 1983, Skip Baker, a free lance photographer, while in the office of Charles Bradford, President of the North American Division of the General Conference in Washington, D.C., overheard Charles Bradford tell Clyde Kinder, on the telephone, that Proctor was taking the food out of the mouths of Literature Evangelists.

74. Bruce Wickwire was the director of the World Field of the General Conference Publishing Department from 1975 to April of 1980 when he retired. His responsibilities were related to the publication and circulation of Seventh-day Adventist literature throughout the world. Before his retirement, Bruce Wickwire was told by John Bernet, Publishing Director of the Lake Union Conference, that Proctor opened a store in Berrien Springs and it could be demoralizing to the Literature Evangelists to be undersold when they gain their livelihood from the commission and they have no fixed income such as Seventh-day Adventist ministers or a college professor. Their work is strictly out of trust and faith. During Wickwire's tenure, the HHES in North America would try to keep the prices they charged to the retail public close together.

75. In the Seventh-day Adventist religion the Sabbath is observed from sundown Friday through sundown Saturday. It is the practice of the Seventh-day Adventists not to engage in their daily activities during the Sabbath.

### B.

At the outset of the trial the court received in evidence all of the documentary exhibits identified in the pretrial order subject to the objections stated therein. Based on the testimony and exhibits presented, additional findings of fact are as follows.

*Church Objectives and Structure*

76. The Seventh-day Adventist Church is an actively evangelistic body dedicated to teaching the gospel of Christ. Its evangelism is based on the belief that the second coming of Christ is imminent and that the Church has been commanded to proclaim the message of Christ. One of the fundamental beliefs of the Church is that Ellen G. White was divinely inspired to be a messenger of the teachings of the Church.

77. One of the twenty-seven fundamental beliefs of Adventists—based on Bible passages—is that "the Church is one body with many members, called from every nation, kindred, tongue and people." Theologically, the Seventh-day Adventist Church is a single unified church. Church documents that prescribe the Church's structure and governance confirm that all parts of the Church are parts of a single entity. Next to the Roman Catholic Church, the Adventist Church is the most centralized of all major christian denominations in this country.

78. The General Conference, as the worldwide governing body of the Adventist denomination, is the Church's highest legislative, judicial and ecclesiastical authority. The General Conference has ten world divisions. The United States is in the North American division. As the Church's highest level of organization, the General Conference may create constituent organizations, arbitrate disputes within and among parts of the Church, establish and revise Church policy, and impose discipline. The General Conference periodically audits the union and local conferences, as well as other church institutions, to determine their compliance with its policies and requirements regarding church and financial matters, and takes action as appropriate to ensure proper compliance. The General Conference also prepares guidelines and structures budgets for the union and local conferences.

79. Union conferences are created by the General Conference. Union conferences are composed of representatives of local conferences within each union. Each union conference in North America holds a constituency meeting every five years. Any member of the General Conference Committee may attend the constituency meeting of any union conference as a voting member.

80. Each local conference holds periodic meetings, at which General Conference Committee members and executive committee members of the union conference in that area may attend as voting members. Local conference executive committees follow directives from the union conference of which they are part.

81. One tenth of the tithe received from church members in each local conference is remitted to the union conference, and each union conference remits to the General Conference one tenth of the tithe funds that it receives from its local conferences. The tithe remitted by the local conference represents the primary source of funds for the union conferences and the General Conference.

82. If a local conference dissolves, its assets are transferred to the union conference. If a union conference dissolves, its assets are transferred to the General Conference. Local conferences may be, and actually have been, expelled from the Church for failure to adhere to General Conference policies. The expulsion of a local conference operates as a dissolution.

83. The Review & Herald is a membership association. The constituency of the Review & Herald consists primarily of the General Conference committee. All members of the executive committees of the union conferences, specified members of the union conferences and officers and certain employees of the Review & Herald are also part of the association. The president of the North American Division of the General Conference, other officers of the General Conference, and the presidents of the union conferences are members of the Review & Herald's board of directors *ex officio*. General Conference officials chair the boards of all major Adventist institutions. The by-laws of the Review & Herald provide that all its assets and earnings must be devoted to the Church's religious mis-

sion. Ten percent of the net earnings of the Review & Herald each year are transferred to the General Conference Committee to support the Church's publishing work outside North America. The Review & Herald is not directed to maximize profit, but merely to maintain itself.

84. Andrews University is owned by the Adventist Church. It is organized as a Michigan not-for-profit corporation. It operates under the supervision of the Lake Union Conference and serves as a training and research center for the world-wide activities of the Church. The mission of Andrews University is to educate Church ministers and leaders.

85. The Commissioner of Internal Revenue granted the General Conference and all its "churches, subordinate divisions, conferences, other organizations and institutions" an umbrella tax-exempt status. This ruling applies to all subordinate parts of the Seventh-day Adventist Church, including the union and local conferences and the publishing houses.

86. The General Conference, union conferences, local conferences, publishing houses, and Andrews University are parts of a single, unified Seventh-day Adventist Church.

*Literature Ministry*

87. A principal purpose of each Adventist conference and publishing house is to spread the Adventist faith. The literature ministry is an essential part of this evangelism. The literature ministry includes the publication and circulation of books and other materials on religious and health related subjects.

88. The ministry is performed by the denominational publishing houses, the literature evangelists, HHES, FHES, and ABCs to win adherents by spreading the Christian gospel as understood by the Adventist Church. The earnings of the publishing houses, the HHES, the FHES, and the ABCs are used exclusively for religious purposes.

89. There are several categories of Adventist literature. Some is given away free and some is offered for sale. This case principally involves "subscription literature" and, to a lesser extent, "trade literature." Most sales of subscription literature are to non-Adventists. Subscription literature is designed to help non-Adventists better understand the Bible and Adventist teaching. Subscription literature is circulated for the most part by literature evangelists with occasional sales through ABCs. Subscription literature includes both books devoted to purely religious matters and books on health-related subjects. The health related books convey an integral part of the Adventist spiritual message which is directed both to spiritual and physical concerns.

90. The circulation of subscription literature is not a profit-making activity. The publishing ministry was subsidized by approximately $10,000,000 in 1984 in the North American Division as a whole compared to total subscription literature sales of approximately $24,000,000. These subsidies came principally from tithe funds contributed by Church members and from other voluntary offerings. The literature ministry is an integral part of the Church's overall evangelistic mission.

91. Literature evangelism is a formal program of the Adventist Church and has been relied on to spread the Adventist message since 1884. Literature evangelists— or "colporteurs"—visit people in their homes to teach the gospel and to spread their message through the subscription literature they offer for sale. The literature evangelist is engaged in the missionary outreach in fulfillment of the mission of the Seventh-day Adventist Church. Typically, the literature evangelist goes door-to-door attempting to engage residents in conversations about contemporary problems and proposing to offer a religious solution. If the householder invites the evangelist into his or her home, the evangelist discusses such problems, offers his or her religious solution, and offers to sell one or more publications published by the Church. The literature evangelist circulates Adventist magazines, pamphlets, and books. Some are given away and some are offered for sale. The circulation of literature is the

principal means by which literature evangelists further their religious mission.

92. The literature evangelist typically offers to pray with an individual or family and to enroll them in a free Bible course and, when an individual shows an interest, conducts Bible studies in the home, and brings non-Adventists to Adventist church services. The evangelist endeavors to arrange a follow-up visit to continue the ministry. Literature evangelists propagate Adventist beliefs through the literature they circulate, through their other missionary activities; and through the christian witness they provide by their conduct.

93. The Church evaluates each Adventist who seeks to serve as a literature evangelist to determine his or her suitability. Literature evangelists receive training in the field, at training schools, and at yearly institutes. They become credentialed only after a probationary period. Every literature evangelist must be an Adventist in good and regular standing, and must be recommended by his or her pastor. A literature evangelist who stops living according to Adventist teaching is subject to termination.

94. Each literature evangelist is assigned a territory and works under the supervision of the publishing director and assistant publishing director of a local conference. Assistant publishing directors must be Adventists in good and regular standing, and publishing directors are ordinarily ordained ministers. The assistant publishing director is a literature evangelist with more responsibility, who works with the regular literature evangelist.

95. Ellen G. White taught that the literature evangelist should make house-to-house calls, should offer materials from Church sources and remit payments received from sales. She wrote that literature evangelists must be motivated by self-sacrifice and should sell only Adventist literature. White taught that literature evangelism is "missionary work of the highest order." She cautioned against selling at low prices.

96. The price of Adventist literature is fixed by the Church. The commission on sales of subscription books is the literature evangelist's principal source of subsistence. Door-to-door evangelists depend on commissions for their support. In addition to commissions, credentialed literature evangelists receive survivor's benefits, health care assistance, worker's compensation insurance, paid vacations, allowances in case of extended illnesses, emergency allowances, rent and travel allowances, retirement benefits, automobile expenses and insurance, reimbursement for transportation and attendance at periodic meetings, moving expenses, travel and lodging in connection with annual camp meetings, educational subsidies, scholarship grants for dependent children, advertising, and assistance from salaried leaders in their sales and other missionary endeavors. These benefits are worth several hundred dollars a month. Licensed literature evangelists receive some of the same benefits as credentialed literature evangelists. Over 70% of the subscription literature dollar goes back to the literature evangelists directly or indirectly. Literature prices are fixed high enough to provide commission income sufficient to provide a living to evangelists.

97. The Church pays literature evangelists a commission because it has found that literature evangelists on a straight salary do not visit as many homes or circulate as much literature. The Church provides literature evangelists with the other benefits described above instead of paying straight commission so that they will not focus exclusively on sales and neglect their other missionary activities.

98. In 1984, more than 19,000 literature evangelists served worldwide, including 1,500 in North America. The number in North America was down from 2,196 in 1982. The number in the Lake Union Conference dropped from 130 in 1981 to 93 in 1984. Defendants offered anecdotal evidence in support of their contention that Proctor's sales below prices offered by literature evangelists tended to discourage entry of evangelists into the Ohio and Lake Union area.

99. The Church directs literature evangelists to circulate only denominational literature because mixing Adventist literature and other literature which does not contain the Adventist gospel message may interfere with the mission to spread the Adventist message. Only hours spent circulating literature supplied through the HHES or FHES are counted in determining the literature evangelists' eligibility for benefits. Through November 1984, literature evangelists were not specifically required to obtain books through the regular denominational channel. However, they would not receive benefits unless they did so.

100. Each Adventist publishing house is authorized by the General Conference to publish only Adventist literature submitted to a denominational committee for approval. The North American Division of the General Conference administers three publishing houses: The Review & Herald, the Pacific Press Publishing Association, and the Christian Record Braille Foundation. Each publishing house operates within a designated territory. The territory of the Review & Herald corresponds roughly to the eastern half of the United States. The territories are established by the North American Division, subject to the approval of the General Conference Committee. A publishing house may accept orders outside its assigned territory only from other Adventist publishing houses.

101. Literature evangelists take orders for subscription literature that are filled through HHES or FHES offices. The HHES and FHES offices receive books directly from the publishing houses. Each HHES and FHES office is the exclusive channel for the circulation of subscription literature within its conference territory, except for occasional sales by ABCs. The ABCs are required to obtain subscription literature from the HHES of the union conference in which they are located. Except for such sales, the HHES and FHES offices are only authorized to fill orders of literature evangelists approved by the local conferences which that HHES or FHES serves. The offices maintain lists of the authorized literature evangelists in their conferences.

102. The ABC is a department of the local conference and is the exclusive channel for the circulation of denominational trade, text, and missionary literature within its territory. The ABCs are the exclusive channel for distribution of all Adventist literature to the Adventist constituency. In accordance with General Conference policy the Michigan, Illinois, Indiana, and Carolina conferences operate ABCs within their territories. The majority of the other local conferences in the United States also operate ABCs. The ABCs obtain trade books directly from the publishing houses at prices established by the North American Division Working Policy. A trade book is meant for use by Adventists. ABCs may not act as jobbers of denominational literature. The Church provides all of the capital for the ABCs and pays the salaries of all employees. ABCs are authorized to establish non-Church owned retail outlets in their territories where a need for additional retail outlets exists.

103. The effect of the vertical price and territorial restraints utilized by the Adventist Church has been to expand sales of Adventist literature at the consumer level. The Church has also found it necessary to utilize all of the activities of the literature evangelists, such as praying in homes and offering Bible study courses, to expand circulation of subscription literature. Territorial and price restraints are imposed by the General Conference policy to advance the literature ministry. The price of subscription books reflects the non-revenue generating activities of the literature evangelists. The restraints are designed to prevent "free riders" from taking advantage of the demand generated for Adventist literature. The elimination of the vertical restrains would diminish the Church's ability to compete interbrand (i.e., to compete with other faiths and ideologies), thereby injuring the consumer.

### Plaintiff's Business Activities

104. Proctor began selling Adventist subscription books as a student literature evangelist. He was a credentialed literature evangelist from 1965 until 1969, when he began to teach at Andrews University. In 1975, while J.W. Proctor, plaintiff's father, was publishing director of the Lake Union Conference, Derrick Proctor entered into an arrangement under which he sold subscription literature obtained from the Lake Union HHES on a part time basis, primarily to Catholic schools and public libraries. His commission was higher than the commission received by literature evangelists. The Lake Union Conference treated Proctor as equivalent to a literature evangelist. There was no understanding that he would undertake a wholesale or retail business in Adventist literature.

105. J.W. Proctor retired as publishing director of the Lake Union Conference in August 1976. John Bernet was appointed publishing director by the Lake Union Conference Committee in September 1976. The General Conference denied a request by J.W. Proctor to purchase subscription literature directly from the publishing house for sale to Catholic schools after retirement. After retirement, J.W. Proctor worked for LES through 1979, and on some occasions in later years.

106. In 1977, the Lake Union Conference reaffirmed the arrangement originally established for Proctor by his father, but Proctor was only authorized to sell to Catholic schools, public schools, and public libraries in Illinois. At this point Proctor still submitted orders to the HHES from customers in Illinois, and was paid a commission. At some point during 1977 Proctor stopped selling Adventist literature for the HHES. During 1977 Proctor and J.W. Proctor also obtained subscription books from sources other than the Lake Union HHES, which they sold under the name LES.

107. Beginning in 1978 and continuing into late 1979 Proctor was able to purchase subscription literature from the Lake Union HHES at a discount of 70.78% off the retail suggested price for resale in Illinois under his special program. This arrangement allowed Proctor a greater discount on subscription books than it gave any other person or entity. This was a pilot program designed to reach groups otherwise reached properly, if at all, by the literature evangelist. At some time in 1978 or 1979, Proctor was authorized to expand his program throughout the Lake Union Conference territory and the Adventist schools in Illinois. The special program set up for Proctor was an exception to church policy, which did not authorize sales of subscription or trade literature to independent wholesalers.

108. LES was open to the general public 16 days during 1979. LES offered Adventist books for sale in 1978 and 1979 to Adventist pastors, teachers, and workers. Purchases were actively solicited. LES also sold Adventist books at a display, at the Illinois Conference All-Workers Convocation on September 30–October 2, 1979 attended by Adventist teachers, pastors, literature evangelists, and office personnel, and at a Church workers meeting in Berrien Springs, Michigan, on September 10–13, 1979. These sales were outside the scope of the arrangements with the Lake Union HHES.

109. In the fall of 1979, John Bernet was questioned by his superiors about the special arrangements that had been created for LES. The Lake Union HHES did not sell subscription books to Proctor after 1979. LES has sent price lists and brochures offering Adventist books for sale to literature evangelists and Adventist pastors. Proctor conducted substantial direct mail advertising to Adventist schools and literature evangelists. Beginning in 1981, LES also sent direct mailings to individual church members listed in some Adventist church directories, and requested that pastors who received his mailings put a notice in the church bulletin. LES also distributed sales announcements on the Andrews University campus.

110. In 1981, 1982, 1983, and 1984 Proctor purchased Adventist books either directly or indirectly from T.S. Barber. Bar-

ber was a full-time, salaried publishing employee of the Lake Region Conference. All of Proctor's purchases from Barber were cash transactions. Nowhere in the files of LES is there a record of any purchases from Barber. These sales were not authorized by church policy or by Barber's supervisors. Barber did not record these sales.

111. Proctor purchased books from Robert Connor of the Lake Union Conference. He bought these books from Connor although Connor was not involved with distribution of Adventist literature. Proctor paid in cash for these sales. No written records were maintained. Proctor did not know where Connor obtained the books. Connor was not authorized to supply subscription literature to Proctor.

112. In 1980, 1981 and 1982 Proctor also obtained books from Great Lakes Books, operated by J.W. Proctor. Great Lakes Books obtained Adventist books from Barber and other sources. During 1980 and 1981, Proctor also made purchases from the Michigan, Illinois, and Carolina ABCs. The Illinois and Carolina ABCs stopped selling to Proctor when reminded of the territorial policy by the General Conference. Both suggested that Proctor order trade books from the Michigan ABC. The Michigan ABC initially sold Proctor trade books, but declined to fill subsequent orders after Proctor unilaterally took a 30% discount and refused to remit the full amount billed.

113. Proctor also obtained Adventist books from other unidentified sources through 1984. He had not received any Adventist subscription books through the Church's authorized channels of distribution since 1979. Proctor has records showing that LES sold Adventist books in every month from August 1981 through December 1983. The record does not reflect any order to Proctor for Adventist literature, through 1984, which he was ultimately unable to fill. Proctor also made sales of Adventist literature to independent sales representatives, who generally bought sub-scription books. Proctor and his expert concede that the success of his business is largely attributable to the fact that he sold Adventist literature at much lower prices than the literature evangelist.

114. Proctor's sales activities were opposed by Church leaders and members. The advertising and sale of subscription books to Adventist pastors, literature evangelists, and others at prices below the prices at which the books are made available to the literature evangelists through denominational channels has caused dissension within the Church. At least one literature evangelist left the literature ministry as a result of Proctor's activities.

115. In addition to selling Adventist books, Proctor has also purchased and resold religious and educational books published by publishers who are not affiliated with the Adventist Church, including Zondervan Corporation, Concordia Publishing, Western Publishing, Thos. Nelson Publishers, and Riverside Publishers. Proctor has also purchased and resold audio cassettes produced by YSH. During 1978 and 1979, Proctor advertised books published by independent publishers at prices below those at which the ABCs could purchase. During the fall of 1979, inquiries were made by ABC managers of Zondervan, Concordia and Western by ABC managers whether Proctor was obtaining books at a jobber discount. The publishers were asked how to obtain the same discount. The managers suggested that this discount was wrong. One threatened to discontinue his business with these publishers.

116. Proctor continued to purchase from Zondervan through the discovery cut-off date.[3] Although Concordia temporarily held up the shipment of one order for two weeks it has never refused to fill any of Proctor's orders and has continued to give Proctor his jobber discount rate. Proctor has continued to do business with Concordia. Western has never refused to fill orders submitted by Proctor. Neither has Nelson or Riverside.

---

3. On June 24, 1983, this court granted summary judgment in favor of Zondervan because the record did not indicate any conspiracy or competitive injury.

117. Adventist literature constitutes less than 10% of the Christian literature sold in North America.

118. Proctor's total annual sales for all products grew from $123,000 in 1978, to $275,000 in 1980, to $319,000 in 1982, and to $633,000 in 1984. Despite this growth in sales the rate of profit as a percent of sales declined, according to Proctor's tax returns. According to his tax returns his profit level during the 1980–84 calendar years has been 5%. Proctor did not obtain audited financial statements for any of the years considered. Proctor's estimated total purchase of subscription literature published by the Review & Herald for 1981, August through December only, was $19,391; for 1982 was $95,396; for 1983 was $85,680; and for 1984 was $187,000. Proctor generally purchased subscription literature outside of recognized denominational channels at discounts of 60% to 70%. As a result Proctor was able to undersell the literature evangelists, and the ABCs. Proctor sold his most popular title, *The Bible Story*, for $79.95 while the regular list price charged by literature evangelists for this title was $269.95. Proctor's purchases of Adventist trade books totaled $3,041.14 over a six year period.

### Settlement of December 19, 1979

119. In November and December 1979, Proctor and his attorney met with representatives of the Lake Union Conference to settle all matters then in dispute, including Proctor's claim that ABC managers had acted improperly by contacting Zondervan, Concordia, and Western. In December 19, 1979, Proctor executed a settlement agreement resolving Proctor's claim of interference. By the agreement, Proctor released the Adventist Church from all liability arising from his claims. Before Proctor signed the agreement he read it, understood it, and consulted with legal counsel. His attorney approved the agreement. The agreement included all of the provisions of the settlement that were agreed to. Proctor received and cashed a check in the amount of $4,700 pursuant to the agreement.

120. On December 20 and 21, 1979, pursuant to the terms of the settlement agreement, Lowell Bock sent agreed upon letters to the independent suppliers whom Proctor claimed had been contacted by ABC managers. He also notified the Presidents of the other union conferences in the United States of the settlement. Bock also wrote to Bruce Wickwire, then publishing director of the General Conference, requesting that he send a proposed letter to union publishing and educational directors and ABC directors in the United States. Bock "requested" that the General Conference send the letter because that was the term used in the agreement and because he did not have authority to direct them to do it. On February 6, 1980, Clyde Kinder sent to all union conference publishing and educational directors and to ABC coordinators in North America a letter which did not materially differ from the proposed letter forwarded by Bock. The final text of the letter was approved by Proctor's counsel in a telephone conversation with Kinder. The settlement imposed no deadline for this letter. The settlement agreement did not require that the General Conference send any letter, but only that Bock "request" a letter. The settlement agreement did not require that the General Conference letter be signed by any particular person. Bock did not tell Proctor or his attorney that Wickwire would sign the letter. The settlement was fully executed. The settlement agreement did not require the Church to resume sales to Proctor.

### The Robinson-Patman Claim Against Your Story Hour

121. YSH derives more than half of its funding from small donations and is operated to a great extent with volunteer labor. Proctor and his father received a special discount when they first began selling YSH tapes in the mid–1970's because they proposed to develop a large market among non-Adventist parochial schools and public libraries. This discount was given in anticipation of high volume sales and development of a substantial sales force.

122. In 1977 YSH unsuccessfully attempted to make a formal contract with Proctor regarding a sales program. In October 1979 YSH had internal discussions about raising the price charged to Proctor because his volume had not reached the level initially anticipated. Proctor never developed the sales organization expected by YSH. In early 1980 William Morgan, manager of the Berrien Springs, Michigan, ABC, sent a note to Ralph Ahnberg, a sales manager for YSH, questioning the low prices to Proctor that allowed Proctor to advertise a resale price lower than the price at which the ABC could purchase from YSH.

123. In March of 1980 YSH informed Proctor that he would be classified as a dealer and be required to pay the standard dealer prices. At that time the dealer price for a single book of Bible Story cassettes was $34.75. Proctor was paying $30.50. The regular price to ABCs was $34.75. YSH told Proctor that it would not be able to sell to him at $30.50 per book after April 12, 1980. Proctor placed no orders with or made any purchases from YSH after April 11, 1980. Negotiations between Proctor and YSH regarding a sales arrangement continued from the spring of 1980 to 1982. During these negotiations Proctor refused to purchase unless he received the lowest price available to any YSH customer. YSH argued that Proctor's volume did not merit such a low price. Proctor's volume of purchases of YSH products in 1979 fell to half of what they were in 1978. His purchases for the first quarter of 1980 show no increase over the 1979 level. During this period Proctor's overall sales grew.

124. The record contains no evidence of a response to William Morgan by YSH with regard to his letter of early 1980. The record contains no evidence of any communication between YSH or its principals with any other defendant regarding Proctor's relationship with YSH or his disputes with the other defendants. YSH never refused to sell to Proctor, and filled all orders placed by Proctor. At all times during the period that Proctor was purchasing from YSH his regular price was as low or was lower than the regular price charged to ABCs or any other customer of YSH.

125. The complete library of Books 1–5 of the Bible Series cassettes was offered to all customers, including Proctor, at a lower price than the sum of the individual books. The library was offered for $147.50 in February 1980; the individual books for $34.75 and half books for $18.00. The library made up of individual books would have cost $157.00. On March 12, 1980, YSH sold to the Michigan ABC three library sets at a unit price of $156.30. The ABC received a 10% discount for a one time promotional sale, a 5% discount for volume, and a 5% discount for payment within three days. Including these discounts the net cost was $28.21 per book. On March 26, 1980, YSH sold to the Michigan ABC individual cassette books at a special "camp meeting" price of $30.00 per book. On April 8, 1980, YSH sold to the ABC a library for $156.30. Only a 5% discount was given on this sale. On February 26, 1980 and April 1, 1980, YSH sold individual cassette books to Proctor for $30.50 per book.

### Damage Claims

126. Proctor's damage expert testified that the damages projection with respect to YSH was only relevant to a refusal to deal or to a price increase high enough to be, in effect, a refusal to deal. There is no evidence that the dealer price proposed to Proctor in 1980 was so high as to prevent Proctor from selling YSH products.

127. Proctor's expert economist did not account for the concept of mitigation of damages, the impact of the free rider problem (i.e., the rate of return Proctor could expect absent the vertical restraints), or the impact of the 1981 recession. He misapplied the concept of diminishing returns, and based his opinion on theories unknown to economics. The expert also made a twelve year projection of damages based on a one year baseline performance and incorporated baseless assumptions concerning Proctor's growth rate and profit margin, and the industry growth rate. He assumed that the prime rate would always

be 10% above the inflation rate. He failed to distinguish between those products at issue and those that were uninvolved in this case. He reviewed no audited or unaudited financial statements or tax returns. He relied solely on Proctor's estimates of the cost of goods sold. His profit projections were not related to Proctor's actual profit level as shown by his tax returns.

## CONCLUSIONS OF LAW

The circulation of religious literature has been accorded First Amendment protection. In *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), the Supreme Court held that a city could not subject canvassers selling religious literature to a municipal ordinance requiring door-to-door peddlers to obtain a license and pay a fee:

> The hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses. It has been a potent force in various religious movements down through the years. This form of evangelism is utilized today on a large scale by various religious sects whose colporteurs carry the Gospel to thousands upon thousands of homes and seek through personal visitations to win adherents to their faith. It is more than preaching; it is more than a distribution of religious literature. It is a combination of both. Its purpose is as evangelical as the revival meeting. This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion.

319 U.S. at 108–09, 63 S.Ct. at 872–73. In *Tate v. Akers*, 565 F.2d 1166 (10th Cir. 1977), the Tenth Circuit specifically held that Seventh-day Adventist literature evangelists were not within the coverage of a municipal ordinance regulating "solicitors" and "peddlers" because "the dominant and primary mission of the colporteur is to spread the gospel and the sale of church literature is incidental thereto and does not convert a minister into a peddler." *Id.* at

1170. The court pointed out that literature evangelism is a

> formal program of the church and has been relied on for more than a hundred years as a primary means of spreading their gospel and gaining converts. A literature evangelist, or colporteur, is a credentialed representative of the church and is considered to be engaged in a form of ministry.

565 F.2d at 1169. The Seventh Circuit also has held that the sale of religious literature is a protected activity. *International Society For Krishna Consciousness v. Rochford*, 585 F.2d 263, 270 (7th Cir.1978); *accord, International Society for Krishna Consciousness v. Bowen*, 600 F.2d 667 (7th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

Because the distribution of religious literature is in controversy in this case, difficult First Amendment religion clause issues are posed. However, it is not appropriate to reach these constitutional issues unless plaintiff is able to prove claims under antitrust and tort law. Accordingly, for purposes of antitrust and tort law analysis, the Church defendants will first be treated as economic entities without regard to religious or First Amendment considerations.

Proctor's antitrust claims against the Church defendants are that he is being boycotted and foreclosed from the Adventist religious literature market by vertical, territorial, price, and market restraints, monopolization and tortious interference with his contracts. To succeed in proving an antitrust claim he must show that the restraints and monopolization are illegal. Proctor's proof shows that he profits by underselling the Church defendants' maintained prices.

Plaintiff's claims fail (1) because the Sherman Act does not apply to the colporteur ministry or to the distribution systems established for the purpose of evangelism, (2) because, even if the antitrust laws apply, plaintiff has failed to establish the elements of any claim, and (3) because

plaintiff has failed to prove an antitrust injury or damages.

## APPLICATION OF THE SHERMAN ACT

■ Sections 1 and 2 of the Sherman Act apply only to "trade or commerce." Colporteurs and systems established to support them are not involved in "trade or commerce" in the sense that those terms are ordinarily used in commercial profit-making activity. Neither the statute nor legislative history contains any indication of its application to religious activities or church organizations. Senator Sherman stated that the act would not apply to churches. 21 Cong.Rec. 2658–59 (1890), quoted in *Missouri v. National Organization for Women, Inc.*, 620 F.2d 1301, 1309 (8th Cir.), *cert. denied*, 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980).

Supreme Court decisions emphasize that Congress intended the Sherman Act to apply only to business combinations with commercial objectives. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 141, 81 S.Ct. 523, 531, 5 L.Ed.2d 464 (1961) (proscriptions of the Sherman Act were "tailored ... for the business world"); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 213 n. 7, 79 S.Ct. 705, 710 n. 7, 3 L.Ed.2d 741 (1959) (Sherman Act "is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives"); *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943) (Sherman Act applies to business combinations, not state action, relying on statement by Sen. Sherman); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 492–93, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940) (labor unions). *See also Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges & Secondary Schools, Inc.*, 432 F.2d 650, 654–55 (D.C.Cir.), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970) (noncommercial activities of non-

profit college accreditation association outside the scope of the Sherman Act); *Swan v. First Church of Christ, Scientist*, 225 F.2d 745, 751 (9th Cir.1955) (church authorities' efforts to hinder publication and dissemination of book among its members bears no resemblance to "trade or commerce" under the Sherman Act).

In the absence of a clear expression of intent by Congress to confer jurisdiction over activity protected by the First Amendment, the Sherman Act is to be interpreted so as to avoid any impairment of First Amendment rights. *See United Mine Workers v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 1592–93, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, *supra*, 365 U.S. at 135–45, 81 S.Ct. at 528–33 (lobbying and other political activities). The Sherman Act is not applicable to distribution of religious literature on the facts presented in this case.

### The Conspiracy and Monopoly Claims Against the Church Defendant

■ Assuming the application of the Sherman Act, Proctor claims that the various parts of the Church named as defendants are independent entities and that they conspired to fix retail prices and to refuse to deal with him. However, this image of the Church is inconsistent with the facts and the logic of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). *Copperweld* dealt with an agreement between a parent corporation and its wholly owned subsidiary. It is logically analogous to the present situation. The decision was based on a complete unity of interest between the corporation and subsidiary that precluded any anticompetitive effect from their agreement. The Church defendants, as unincorporated associations, have a unity of interest.[4] Administratively, the Adventist church is a highly centralized unified body. Its goals and policies are promulgated

---

4. The not-for-profit corporations which hold property for the various conferences were vol-

untarily dismissed from the suit.

worldwide through the General Conference. All revenue generating activity engaged in by the Church is in furtherance of the religious goals of spreading the Adventist gospel. Except for the literature evangelists all personnel are salaried employees. Given this unity of purpose the units of the Church are not engaged in competition. They work together in competition with other denominations and religions.

Plaintiff introduced the testimony of a political scientist who has studied the structure of the Seventh-day Adventist church. This witness related that the structure of the Church and its constituent units are very similar to the structure of the federal government in the United States—both juridically and legislatively. From this study he concluded that because the states are separate entities in the federal system so too are the union conferences separate entities in the Adventist church—and therefore capable of conspiring among themselves and with the General Conference. This line of reasoning and analysis lays stress on political and theological theory. Such theories, however, are inappropriate for the resolution of the *legal* and *economic* questions posed by the facts in this case. It is not necessary to decide how the Church operates in practice or theory to resolve the claims of the plaintiff.

Section 1 requires concerted action between two or more enterprises for a violation. The facts of this case establish that the Seventh-day Adventist Church is a single unified body governed by the General Conference. As such it is incapable of conspiring in violation of § 1 of the Sherman Act. *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430 (7th Cir.1986).

■ Proctor also charges that the Church defendants violated § 2 of the Sherman Act. The offense of monopoly under § 2 has two elements: (1) possession of monopoly power in a relevant market, and (2) conduct designed to maintain or enhance that power improperly. *Aspen Skiing Co. v. Aspen Highlands Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Olympia Equipment Leasing v. Western Union Telegraph Co.*, 797 F.2d

370 (7th Cir.1986); *Morrison v. Murray Biscuit Co., supra.* Proctor has not established a relevant market within which the Adventist Church has monopoly power.

■ Proctor alleges that the relevant markets are religious literature in general and a submarket—Seventh-day Adventist literature. The Adventist Church does not possess significant market power with respect to religious literature—that is "power to raise price above the competitive level without losing so many sales that the price increase would be unprofitable." At most, Adventist literature accounts for less than 10% of the religious literature distributed in the United States. This is not a predominate share of the market from which a monopoly can be inferred. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Proctor made no effort to show that the Church had market power in religious literature.

Seventh-day Adventist literature is not a relevant market or submarket; it is a product. Other than the activity of Proctor there is no competition in the sale of Adventist literature. This is the result of the Church's natural, lawful monopoly of its own product. *United States v. E.I. Dupont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). The distribution of Adventist literature is in competition with other denominations and religions in its ultimate goal to win converts. To achieve this the Church is entitled to distribute its literature through its own system. A firm with a lawful monopoly has no duty to help its competitors. *Olympia Equipment Leasing Co., supra*, 797 F.2d at 375.

Proctor also alleges attempt to monopolize under § 2. There is no evidence in the record of the Church trying to monopolize the market for religious literature. As to Adventist literature, a lawful monopoly bars a claim of unlawful attempted monopoly. *Olympia Equipment Leasing Co., supra*, 797 F.2d at 373.

Proctor has not proven that the Church defendants violated § 1 of the Sherman Act

by conspiring with any other entity. Proctor alleges that in 1979 the ABCs contacted independent publishers and complained about his low prices. This is not disputed but it is insufficient to prove a conspiracy in violation of § 1. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Moreover these complaints occurred in 1979 and are barred by the settlement agreement of December 19, 1979.

### The December 1979 Settlement

■ On December 19, 1979, Proctor and the Lake Union Conference executed a written settlement agreement. Proctor claims non-performance of oral and written terms eliminates the effect of the settlement. As part of the agreement Proctor was paid $4,700, and he released the Seventh-day Adventist Church and its entities from liability for any previous interference with his suppliers. The Lake Union Conference also sent out agreed upon corrective letters and requested a letter from the General Conference publishing department. This letter was sent and did not differ materially from that agreed upon. The settlement agreement is complete on its face; it was performed and the release bars adjudication of Proctor's pre-settlement claims. *Erkiletian v. Devletian*, 299 Mich. 95, 299 N.W. 821 (1941).[5] Proctor claims also that he was verbally promised several additional terms. This claim was not proven. Moreover, a written settlement agreement supercedes all prior and contemporaneous oral agreements. *Siporin v. Adler*, 364 Mich. 549, 111 N.W.2d 848 (1961); *Pratt v. Castle*, 91 Mich. 484, 52 N.W. 52 (1892); Restatement of Contracts §§ 237, 238 (1932).

There is no evidence that Proctor ever tendered recision of the proceeds of the settlement agreement, a prerequisite for bringing suit on the underlying claim. *Pangborn v. Continental Insurance Co.*, 67 Mich. 683, 35 N.W. 814 (1888); *McDonald v. Zinn Drywall*, 134 Mich.App. 270, 350 N.W.2d 864 (1984). Having ac-

cepted and retained the benefit of the settlement agreement, Proctor may not now avoid the terms of the release.

Because the settlement is binding, Proctor's claims against the Church defendants rising out of actions prior to December 19, 1979, are barred from consideration.

### Tortious Interference

Proctor charges the Church defendants with tortious interference with his business relationships. This claim is that the Church defendants interfered with his business dealings with Adventist entities and with independent suppliers.

The intrachurch claim fails because the Church is a single entity. A party cannot be liable in tort for interfering with its own business. *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216, 221 (7th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 79, 88 L.Ed.2d 64 (1985). The claim regarding interference with independent suppliers also fails. Any interference by Church defendants with Zondervan or Concordia occurred prior to the settlement agreement. Proctor has not proven any interference by the Church defendants of his transactions with Your Story Hour. Other suppliers did not alter their relationship with Proctor in any way.

### Antitrust Injury and Damages

■ Proctor's antitrust claims against the Church defendants must also be rejected because he has not shown that he suffered any antitrust injury. Antitrust injury is injury that the antitrust laws were designed to prevent. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977). The injury that Proctor alleges is indistinguishable from that of the plaintiff in *Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197 (7th Cir.1986). Local argued that it was terminated as a distributor in furtherance of an illegal price maintenance scheme in order to pacify oth-

---

**5.** A settlement is a contract and as such is governed by local law. *Airline Stewards v. Trans World Airlines*, 713 F.2d 319 (7th Cir.1983). The settlement agreement was executed in Michigan; thus Michigan law governs.

er distributors who were complaining about Local's sub-jobbing. The Seventh Circuit held that:

> The damages claimed by Local do not present the type of injury that the antitrust laws were intended to remedy. In its complaint, Local attempts to recover lost profits from sales of Lamaur products. Local claims that its termination was a result of Lamaur's desire to maintain prices and pacify local distributors because Local was undercutting the fixed prices. Local was admittedly subjobbing. Sub-jobbing is selling at low prices to discounters who then resell to the consumers. In this way Local could avoid additional costs of advertising and promotion and "free ride" off of the other full service distributor's efforts. Thus Local's market (discounters) and profits were a direct result of the maintained prices. Local was profiting from the antitrust violation itself.

787 F.2d at 1202. The evidence shows that Proctor was benefitting from the Church defendants retail price maintenance and territorial restraints. Even if the restraints were unlawful Proctor is barred from recovery because, in the absence of the restraints, Proctor does not show that he could have been successful. *Local Beauty Supply, supra,* at 1204.

▇ Proctor has not proven that he was injured by the defendants. Through 1984 Proctor's business has grown substantially and he has not been able to identify any orders that he was ultimately unable to fill. As testimony indicated, Proctor is a "fighter." Whatever adversity Proctor has met as a result of the defendants' actions he has been able to overcome. He has been able to obtain Adventist Books from other sources and has been able to substitute other products when he has not. In order to show injury a terminated distributor must show an inability to obtain the product. *J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787 (5th Cir.1983). Proctor has not met this burden.

Proctor's damage estimates and projections are substantially flawed. His economist has not supported his conclusions with sound economic theory or with documentary evidence. In *Olympia Equipment Leasing Co., supra,* at 382, the Seventh Circuit warned of the dangers of expert testimony as to damages. In this case, as in *Olympia,* the expert's findings bear little relation to economic reality. Proctor offers no alternative evidence from which an award of damages could be estimated. Had Proctor established liability, he would be unable to recover any damages.

### Your Story Hour Claims

Proctor has offered evidence of price discrimination in violation of the Robinson-Patman Act § 2(a), 15 U.S.C. § 13(a) (1976) against defendant YSH. He has produced evidence showing two sales of books of cassettes at different prices by YSH to Proctor and to another purchaser within the same time period. Both sales were across state lines.

▇ Price differences are sufficient to establish a threshold case of price discrimination. *Federal Trade Commission v. Anheuser-Busch, Inc.,* 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). However, a private treble damages claim under the Robinson-Patman Act requires a showing of actual injury to the plaintiff as a result of the price discrimination. *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). Proctor has not met this burden. Proctor's damage estimates for YSH are based on estimated lost profits from refusal to deal rather on the effects of price discrimination. They are inapplicable in the context of a Robinson-Patman price discrimination claim.

The price discrimination claim is limited to two small sales to a Michigan ABC in March 1980. Proctor offered no evidence that these particular sales harmed his business. Even under the broad inference of injury rule applied to public suits, Proctor has not shown any substantial price discrimination continuing over time. *Federal Trade Commission v. Morton Salt Co.,* 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948).

Even if Proctor's refusal to deal damage claims were valid they are contradicted by his own testimony. Proctor claims past damages from 1981 through 1984 of $40,061 representing a 30% markup of $133,538 in sales that he would have made had he been able to sell YSH products. However, in 1980 YSH attempted to contract with Proctor for him to sell $100,000 worth of their products over a five year period. Proctor protested that he could not meet that volume.

▪ Proctor cannot project future damages in a price discrimination case. *Stevens v. Zenith Distributing Corp.*, 568 F.Supp. 1200 (W.D.Mo.1983).

▪ Proctor also asks for injunctive relief. It is necessary to prove actual injury to obtain a permanent injunction. Proctor has not done so. Proctor has failed to prove a conspiracy between YSH and the Church defendants in violation of § 1 of the Sherman Act. The only evidence is that William Morgan wrote a note to YSH in early 1980 complaining about Proctor's prices. In March 1980 YSH reclassified Proctor as a dealer and raised its prices to him.

A complaint from a competitor is insufficient evidence for inferring a conspiracy, even if action is taken as a result of the complaint. The plaintiff must prove a "conscious commitment to a common scheme designed to achieve an unlawful objective," and produce evidence tending to show that the defendants' action were taken as a result of the conspiracy. *Monsanto Co. v. Spray-Rite Co., supra*, 465 U.S. at 764, 104 S.Ct. at 1470; *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 612 (4th Cir.1985). Proctor has not met this burden. His conspiracy claims against YSH are without merit.

IT IS THEREFORE ORDERED that:

(1) The court finds the contested issues of fact and law in favor of defendants and against the plaintiff on the merits.

(2) Leave to file with respect to materials lodged with the Clerk of the Court after September 9, 1986, is denied.

(3) The Clerk of the Court is directed to enter judgment in favor of the defendants and against the plaintiff dismissing this case with prejudice with costs to the defendants.